No.———

First Circuit

---

## ALLEN v. CURRIE, ET ALS.

---

(February 15, 1928.    Opinion and Decree.)
(March 7, 1928.    Rehearing Refused.)
(April 9, 1928.    Writs of Certiorari and Review Refused by Supreme Court.)

---

*(Syllabus by the Editor)*

1. **Louisiana Digest—Conspiracy—Par. 1, 3; Offenses and Quasi Offenses—Par. 4, 10.**

Where several high school students without cause rushed out of a room, one holding a bottle of acid which he threw on another boy, they are guilty of a conspiracy to do an unlawful act and each one is liable in solido for the damages done.

2. **Louisiana Digest—Damages—Par. 103, 104.**

Fifteen hundred dollars is considered sufficient quantum of damages for injuries inflicted by the throwing of acid which

caused severe pain and confinement in his home for two months and under medical attention for three months.

Appeal from the parish of East Baton Rouge. Hon. Wm. Carruth Jones, Judge.

Action by Dennie R. Allen against William C. Currie, et als.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

D. J. Sanchez and Benton & Benton, of Baton Rouge, attorneys for plaintiff, appellant.

Chas. A. Holcombe and C. C. Bird, of Baton Rouge, attorneys for defendant, appellee.

MOUTON, J. Plaintiff is suing in damages for the benefit of William Allen, his minor son, the fathers of the following named minors: William C. Currie, Jr., Robert E. Stearns, Jr., Marion Roberts, Carrol Sandifur, Bert Jordan, Dominique Arrighi and Shirley Arrighi, all residents of the City of Baton Rouge. The amount claimed is $10,095.50 for the alleged injuries which resulted from the throwing of a poisonous acid on the face and neck of William Allen on December 17, 1924. The throwing of the acid on Willie, as he is referred to in the testimony, occurred in the Baton Rouge High Schol Building on Florida Street, at night, at about 10 o'clock. The minors hereinabove named, were all pupils of that school. They had organized a juvenile club or society, which they had named "The Lion Tamers Club." They say they were all members of the club with the exception of William C. Currie, Jr., who had. not been initiated, but who was to become a member.

These boys usually met in a small room in the eastern corner of the building. They met there for amusement and study. Though they had no permission from the school authorities to assemble in that building, their meetings, as far as the record discloses, were not prompted by any evil or unlawful design, and were harmless.

The proof shows that on the night of the occurrence, Willie Allen, Charles Collier and Bowman were walking eastward on Florida Street, and that just as they passed the eastern corner of the school building they saw a light burning in the room where the boys of the "Lion Tamers Club" were having a meeting. The door of the building was open, and Allen, with his companions, being attracted by the light they had seen, entered the building and proceeded by the stairway to the fourth floor where the room is located. Allen and his companions were unarmed and did not know who was in the room where they had noticed this light towards which they proceeded quietly and noiselessly.

Counsel for defendant seems to intend to convey the idea in their brief that Allen and his companions were moving furtively on the stairway as they ascended, and that they were prompted by sinister motives.

It is true, as was the case with the boys who occupied the room where the light was shining, that neither Allen nor his companions had permission from any one in authority to enter this building, but there is nothing in the record to indicate that they went in or proceeded up on the stairway with the slightest intention of committing any wrong whatsoever. They did not know, as the evidence clearly shows, who were those that occupied the room where they saw the light, and they could certainly not have been actuated by any evil design in entering or continuing on to the fourth floor. They were simply attracted by a feeling of curiosity and nothing else.

Allen and his companions reached the fourth floor, and when they got near or opposite the room where the meeting was being held, the floor creaked or some other noise occurred which was overheard by the boys in the room. It is shown that at that time these boys in the room were engaged in the telling of jokes or stories. As soon as they heard the noise in the hallway or near the door, the light immediately went out, and out of seven boys in that room, six rushed out together or in a bunch. Several, if not all, with bottles in their hands. All was then in darkness with the exception of one or two flashlights which one or two of the boys carried as they rushed out of that room.

Allen and his companions fled immediately, and without showing the least desire to resist or do any bodily harm to any one, a fact which corroborates our first statement to the effect that Allen and his companions had not gone up to that room with the slightest design to commit any wrong or to do any injury. They fled, as before stated, and the boys who had rushed out of the room chased and pursued the fleeing Allen, and Collier, one of his companions, westward through the building from where Allen and Collier ran downward along the stairway, and as they reached the third or second floor, acid was poured from a bottle and fell on Allen's neck and face.

It is shown by the testimony of the boys who were in the room that the acid was thrown by William Currie, Jr., who, they say, was a mere invited guest, and had not then been initiated into the mysteries of the club. Proof that it was thrown by Currie is confirmed, it is claimed, by the fact that some of the acid fell on Currie, and on Stearns who was immediately behind him when it was poured from the second or third floor on the fleeing Allen.

It is shown that several bottles were brought up in that room in which water was kept for drinking purposes, where lunches or meals were occasionally eaten by members of the club. These bottles, it is claimed by defendants, were all used as containers for water, with the exception of the bottle in which this acid was kept.

It is claimed by the boys of the club that this acid had been kept in that bottle for use in a radio battery they had up there. These bottles it is shown were ranged on a shelf in the room with no mark whatsoever on this bottle that contained the acid. The fact is, that the bottle of acid stood in the middle of the row and that the acid it contained was not distinguishable from the water in the other bottles.

If these boys had been mere children such carelessness would, perhaps, be probable, but for high school students, ranging in age from sixteen to eighteen, to permit this bottle of poisonous acid to remain there undistinguishable by any label or other mark, seems to us incredible. This conclusion is emphasized by the fact that Currie, their invited guest as claimed, was not warned of the danger that lurked in this bottle of acid which defendants contend had been placed side by side with the bottles that were used for drinking purposes. Such conduct is not consonant with the ordinary rules of conduct in young men of that age.

There is another strange circumstance about these innocent appearing bottles that were permitted to sit in a room without designation or marks to distinguish one from the other. The fact is, that not a single one, as testified to by a member of the club, had a stopper. This was cer-

tainly a peculiar fact. That the bottles were on the shelf that night, there seems to be no doubt; that not a single one had a stopper, not even the one with the deadly poison, is suggestive and cannot be accounted for unless there was a design or purpose in permitting such a condition of affairs in the room in which the members enjoyed their convivialities, including Currie, their pretended invited and innocent guest.

As we proceed in the analysis of this evidence, we believe the facts will reveal the reason why these bottles, including the one containing the acid, were left open. The evidence shows that the very moment the noise on the stairway or near the door was heard by the boys in the room, the lights were turned out, and that each, if not all of the six boys rushed out together, grabbed one of the bottles and chased the intruders down the stairways of the building.

Robert Stearns, one of the boys who testified in the case, admitted that their meetings had been previously interrupted by intruders who had entered the building. No doubt, it was determined that these intruders had to be taught a lesson for entering the building and thus to invade the privacy of the association. The bottle of acid was kept evidently in readiness to effect the contemplated correction. If not so, how is it possible to account for the fact that immediately upon hearing the noise, the light was turned down and every one of the six boys including the pretended invitee, should by common concert of action grab a bottle and pursue the invaders? If they had not known that these bottles were uncorked is it rational to believe that some investigation would not have been made to ascertain that fact before they rushed out with the bottles in hand and which they used only and solely for the purpose of pouring their contents on the boys who had taken to their heels?

Counsel for defendants refer to the prehistoric days of the cave man in support of their contention that on sudden attack, even men of mature years will, in the exercise of their natural right of self-defense, meet or repulse any aggressor who may attempt to encroach on their rights. This is unquestionably true. It is, however, known that when men undertake to defend themselves under such circumstances, force is used to repulse the attack or the danger, if it is believed there is any. If the boys in that room had really acted under the belief that they were threatened with bodily harm or such like, how is it possible to understand that to repel such an attack, bottles which they thought contained water would be used for that purpose? We do not believe that.

The proof shows that there was perfect unity of action, not only in the grabbing of the bottles, but in the emptying of them on the intruders. Is it not singular and really unbelievable that by one common impulse those six boys or most of them should each grab a bottle of water to throw on the intruders, including Currie the pretended invited guest, who used a bottle claiming he thought they all contained water, as he had not been apprised that one had the poisonous fluid?

There is no question that the other boys knew that this acid was kept in one of these bottles, and still they rushed out with the bottles they had suddenly picked from the shelf, and threw or attempted to throw their contents on the intruders. Is it possible to believe that unless they were bent on mischief that these containers would have thus been emptied on those they were pursuing?

Currie was asked if the question had not

been propounded to him as to which of the boys had thrown the acid, and that his reply was: "You would think I am a fool if I told you." He would not deny that he made this statement in answer to the question which was thus propounded to him. The fact is, he admitted that he could have said what he was charged with stating in reference to that question. If he had innocently and unknowingly thrown this acid, as he now claims, he certainly would, when questioned immediately after the occurrence, have admitted that he had thrown the acid on Allen with accompanying expressions of regret that would be expected from any normal man under such circumstances. Instead of doing this, he says: "You would think I am a fool if I told you." We accept this statement as his answer, as other witnesses swore that he made it, and this he does not deny and in fact admits that he might have made. We conclude that he knew, as it was known to the others, that this acid was in one of the bottles standing on the shelf, and in concert with the others, grabbed a bottle for the purpose of throwing whatever was in that container on whomsoever it might be that had come into the hall near the doorway of the room where the club was having its meeting.

Robert Stearns, a witness, and one of the boys who was in that room, admits he also grabbed a bottle, followed the fleeing intruders, but says his bottle contained water. He was asked if he had not told Bert Jordan, one of the boys, that Marion Roberts should not have done that, the question and answer having reference to the throwing of the acid. The question was also propounded to him as to whether he had not asked one of Willie Allen's companions if any of "you fellows had got burned." His answer was at first, that he did not remember if he had given such answers to these inquiries, but he finally said he would neither deny or affirm that he had or had not.

Collier and Bowman, two of Allen's companions, both say that Stearns had asked if anybody had been burned. The unsatisfactory testimony of Stearns on this question leaves no doubt in our minds that he had made that remark. Stearns and likewise the other boys in that room, including Currie, knew that there was a bottle on that shelf containing poisonous acid, which was thrown on Allen with the intention of inflicing an injury on whomsoever had appeared in that hallway. The act was not directed against Allen personally, as they did not know who had entered the building, but their purpose was to castigate or punish whomsoever these intruders might be.

It is shown that on the night of the occurrence Willie Allen, on being questioned by the police officers, said that he was sitting outside of the building when the acid was thrown on him. He admitted as a witness that he had made this statement, and that it was not true. His reason for making this statement, he says, was that he did not want these boys to get into trouble, or to avoid the publicity of a trial in the police courts, and that he did not then think "it would be as bad as it was." In making that statement, Allen could not have been impelled by a desire to deceive in order to gain any advantage or benefit for himself or any other individual. He could have no corrupt motive, and was actuated, we think, by some fancied fear due to his youth or inexperience. However, this may be, the fact remains that the acid was poured on him by Currie, not while he was outside the building, but during his flight down the stairway. That is unquestionably true and his

statement that he was outside the building, cannot affect the case.

Counsel for defendants say in their brief:

"In a word it all gets back to the same point that to show any culpability (either by negligence or otherwise) the plaintiff must show that these sons of the defendants agreed together to do certain things and that in the absence of such showing there was neither conspiracy nor culpable negligence."

Counsel for defendants admit as an obvious proposition that conspiracy can be proved by circumstantial evidence, and as they say properly "usually must be proved that way for the reason that there is seldom any testimony of the conversations taking place between conspirators."

In this case there was no conversation proved by which a conspiracy could be established, but the facts and circumstances of the case hereinabove analyzed, show that a plan had been pre-arranged between the sons of these defendants to chastise any intruder that might disturb their meetings, and in the way it was accomplished in this case. If not pre-arranged, these boys were all aware of the fact that this bottle of acid was on that shelf, and when they realized that intruders were in the hallway, by a combination or a common understanding formed at that time, they rushed out in a body with bottles in hand, and in pursuance of a common purpose they attained their common object by committing the unlawful act of which plaintiff complains. This, we infer from the relation that existed between them, from the act done, and the results achieved. The act committed was the result of a conspiracy which is generally defined to be an agreement between two or more persons to do an unlawful act or an act which may become, by the combination, injurious to others.

The defendants are therefore liable in damages. The injuries inflicted on Allen were severe and the pains he suffered as a result, intense. He was confined in his home for a couple of months, and was under medical attention for three months. Plaintiff is entitled to damages against defendants in the sum of $1500.00 in solido with costs of court.

It is therefore ordered, adjudged and decreed that the judgment appealed from be avoided and reversed; that plaintiff have judgment for the sum of fifteen hundred ($1500.00) dollars for the use and benefit of William Allen, his minor son, against William C. Currie, Robert E. Stearns, William P. Roberts, Guy Sandifur, Elbert L. Jordan and Donnie Arrighi, defendants, in solido, with legal interest from judicial demand, and costs of court.

————

## ON APPLICATION FOR REHEARING

MOUTON, J. In the application for rehearing, counsel for defendants say:

"Petitioners further show that this Honorable Court erred in holding that the Lion Tamers Club had been interrupted or intruded upon before this occasion. There is no evidence to this effect and it is denied by witnesses for defendants and is only attempted to be shown or suggested by questions asked by the adroit counsel for plaintiff and not by answers whatever."

Robert E. Stearns, Jr., witness for defendants, and a member of the Lion Tamers Club, was asked the following question:

"Who was it that had molested the Lion Tamers Club at a meeting some time prior to this night?
"A. I don't know who it was."

This answer is certainly pregnant with the admission that the club had been previously molested.

He was again asked:      .

"How many times had the club been
molested at its meetings in that place?
"A. I couldn't say that either.
"Q. You couldn't say how many times the
club meetings had been molested and dis-
turbed by outside parties coming there?
"A. No, sir."

These answers carry no denial that the
club had been molested or disturbed at
times prior to the night the acid was
thrown on Allen. The answers merely in-
dicate that Stearns could not remember
how often these disturbances had occurred
prior to the one in question. If these
answers are to be so construed as to leave
it in doubt as to the previous disturbances,
the question and answer following makes
it clear that the meetings of the club had
been previously interrupted, viz:

"Q. You had been interrupted there be-
fore, though?
"A. Well, we were just interrupted to
the extent that we heard them in the
building, but they never did come up to
the room, however, before."

In our original opinion we said with
reference to this feature of the evidence,
that: "Robert Stearns, one of the boys who
testified in the case, admitted that their
meetings had been previously interrupted
by intruders who had entered the build-
ing." No comment is necessary to show
that the Court had ample evidence to
support that statement, and from the
testimony of defendants' own witness.

We refer to that evidence because it sup-
ports the conclusion reached by us that
there had been concert of action on the
part of the defendants in committing the
act for which damages were allowed to
plaintiff.

Counsel also say in their application that
we fell into an error in saying in our
opinion that the bottle containing the sul-

phuric acid was "in the middle" of the
water bottles, while as a matter of fact
these bottles were in a different part of
the room. It is possible that we fell in this
inaccuracy in going over this record in
our earnest effort to properly analyze the
evidence so as to discover the real motive
which actuated these boys in committing
this unjustifiable act. Such inaccuracy
is, however, of no importance, as it does
not and cannot affect the material parts
of the evidence upon which we have
grounded our conclusions, which we find
no reason to change after a re-examination
of the points presented in the application.